ARTHUR J. GRAVES JR., Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 24957

February 29, 1996                                    912 P.2d 234

*Moran & Weinstock,* and *Andrew Leavitt,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney and *James Tufteland,* Chief Deputy District Attorney, Las Vegas, for Respondent.

## OPINION

By the Court, SHEARING, J.:

Police investigators observed appellant Arthur J. Graves, within hours after his release from the Clark County Detention Center, entering casinos, suspiciously walking up and down the aisles, observing and spying on casino patrons, and exiting. He allegedly attempted to steal from a patron at the Fremont Casino and a casino cage at the Horseshoe Casino. The next evening, after police investigators observed Graves and two individuals enter a casino, walk around observing patrons, and approach the patrons, but observing no criminal act, the police, without a warrant, arrested Graves.

On the first day of trial, Graves moved the court to allow him to represent himself. After canvassing Graves, the district court granted Graves' request, but postponed the trial for three weeks to allow him to prepare for trial. Graves objected, arguing that

the postponement would deny him the right to trial within sixty days. The district court overruled Graves' objection. Graves was convicted at trial, pursuant to a jury verdict, on two counts of burglary.

On appeal, Graves claims that he did not knowingly and intelligently waive his right to counsel. He also asserts other errors: lack of substantial evidence to support the jury's verdict, improper joinder of charges, denial of his right to a speedy trial, and the warrantless arrest.

On the first day of trial, Graves' appointed attorney informed the district court that Graves wished to bring a motion before the court to be appointed as his own counsel. The following canvass ensued:

> THE COURT: You desire to represent yourself still, Mr. Graves?
>
> THE DEFENDANT: Yes.
>
> THE COURT: I'm going to give you a canvas [sic], which we need to do to see if you're able to do that.
>
> First off, let me say it amazes me you would want to do this. You have one of the best, if not the best criminal attorney [sic] in this town and you want to set him aside and represent yourself?
>
> THE DEFENDANT: If it's okay with the Court I'd like to do that.
>
> THE COURT: It's your choice to make. I just want you to know some of the things involved in making that choice.
>
> You do know you have a constitutional right under the Faretta ruling to represent yourself if you wish to; do you?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Have you talked this over with your attorney?
>
> THE DEFENDANT: Yes, I have.
>
> THE COURT: And you wish to represent yourself?
>
> THE DEFENDANT: Yes, I do.
>
> THE COURT: Do you think it would be in your best interest to do so?
>
> THE DEFENDANT: Yes, I do.
>
> THE COURT: I have to tell you that if you do represent yourself, that you'll be held to every standard as far as procedure and all the rules of the Court that you would have if you had the assistance of an attorney; do you understand that?
>
> THE DEFENDANT: Why [sic], Your Honor.
>
> THE COURT: You also understand you'll be giving up some rights, some constitutional rights which you might

have had if you had had an attorney when you act as your own attorney; do you understand that?

THE DEFENDANT: Right, Your Honor.

THE COURT: One of those rights is if you act as your own counsel you cannot then at a later time have an appealable issue on ineffective assistance of counsel because you'll be doing that yourself.

THE DEFENDANT: Right.

THE COURT: Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So even if you are ineffective, no matter how ineffective you are, you lose that right at any later time on appeal to say that you had ineffective assistance of counsel; do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you had an opportunity to look at all the discovery that Mr. Amundson has provided you?

THE DEFENDANT: Yes, Your Honor, I've had preliminary transcript for over a month, I have the police reports. I'm ready, Your Honor. I've reviewed them several times.

THE COURT: I want you to know that I, especially in this case, since you have a good attorney representing you, that I think it's a mistake for you to represent yourself; do you understand that?

THE DEFENDANT: Yes.

THE COURT: I also have to inform you that you will have no license to abuse the dignity of the Court if you represent yourself; that is, I'll hold you to the same standard of decorum and same—and all the same rules if you represent yourself. And if it comes to the point you do disrupt the Court when you represent yourself, do you understand that I will then terminate your representation and assign an attorney to finish out the trial? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: In other words, you just have to be as nice as an attorney would be in representing yourself.

THE DEFENDANT: I understand.

THE COURT: Sometimes that isn't too nice but you'll at least be held to that same standard; do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you also understand that at the time of trial, if you represent yourself, I'm going to appoint Mr. Amundson to be your stand-by counsel; do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And he'll be sitting there and you can ask him anything you wish to ask him about procedure, but I'll not allow him to react to the procedure in any other way. That is, I won't be allowing your stand-by counsel to make any objections or anything else during the course of a trial. When an objection is missed at trial it will be because you missed it and that's one of the penalties of representing yourself?

THE DEFENDANT: Yes.

THE COURT: But I will allow you at the time of trial, I'll give you time to talk to Mr. Amundson and inquire of him of any advice that you may need at the time of trial; do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: In the dissenting opinion of Feretta [sic], after they say that it's a constitutional right of a defendant to be able to represent himself, they also say that gives the defendant a constitutional right to make a fool of himself because of the old proverb which says one who represents himself has a fool for a client.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And I want you to know that I feel that's true; do you know that?

THE DEFENDANT: I do.

THE COURT: I have to tell you, after I've seen many defendants represent themselves that I think that's more true than ever, that it's a foolish thing to do; do you understand that?

THE DEFENDANT: Yes.

THE COURT: Do you still want to do it?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: All right. I'll allow you to represent yourself.

Graves argues that the district court's canvass was insufficient and requires reversal of his conviction because the district court never explained the facts, the nature of the charges or offenses, or potential defenses the defendant faced or could use. Graves further notes that the district court never explained the allowable punishments or the possibility of being sentenced under the habitual criminal statute. Finally, Graves notes that he had not represented himself previously and that the district court made no specific inquiry into his background and experience. Thus, he

claims that he could not have knowingly and intelligently waived his rights.

The United States Supreme Court stated in Faretta v. California, 422 U.S. 806 (1975):

> Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams v. United States ex rel. McCann,* 317 U.S. at 279.
>
> . . . We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on *voir dire.* For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.

*Id.* at 835-36 (footnote omitted).

We believe that the record clearly demonstrates that Graves was aware of the dangers and disadvantages of self-representation. The judge repeatedly warned Graves of the dangers and disadvantages and explicitly outlined many of them. As already noted in the *Faretta* quotation, no assessment need be made as to how well or poorly a defendant has mastered the intricacies of court procedures and rules. The only question is whether the defendant "competently and intelligently" *chose* self-representation, not whether he was able to "competently and intelligently" represent himself.

*Faretta* makes clear that the defendant's technical knowledge is not the relevant inquiry. 422 U.S. at 835-36. In order for a defendant's waiver of the right to counsel to withstand constitutional scrutiny, the judge need only be convinced that the defendant made his decision with a clear comprehension of the attendant risks. Trial judges must determine whether defendants waive their right to counsel with a full understanding of the disadvantages. This court will give deference to their decisions. Through face-to-face interaction in the courtroom, the trial judges are much more competent to judge a defendant's understanding than this court. The cold record is a poor substitute for demeanor observation.

The fact that the canvass did not expressly cover Graves'

background, education or experience did not mean that the judge could not learn a great deal about his level of intelligence and ability from his dialogue with the defendant. In any event, the judge had the record before him from which he could see that the defendant had previous experience in preliminary hearings and trials. Moreover, Graves affirmatively established that he had reviewed the preliminary hearing transcript and all the police reports which would be necessary for cross-examination of witnesses. In addition, the judge had before him a pro se Motion to Dismiss from which the judge could determine the defendant's level of legal knowledge regarding his case. This evidence certainly supplied a sufficient basis for the judge to determine that Graves had the minimum intelligence and ability necessary to represent himself.

Graves also faults the trial judge for not determining that he understood the nature of the charges he faced, possible defenses, or the range of the allowable punishments involved. However, *Faretta* does not require an explanation regarding the elements of the crimes charged and the possible defenses. Arajakis v. State, 108 Nev. 976, 980, 843 P.2d 800, 802-03 (1992).

In Haberstroh v. State, 109 Nev. 22, 26, 846 P.2d 289, 292, *cert. denied,* 510 U.S. 858, 114 S. Ct. 169 (1993), this court rejected the necessity of a mechanical performance of a *Faretta* canvass. Even the omission of a canvass is not reversible error if "it appears from the whole record that the defendant knew his rights and insisted upon representing himself." Wayne v. State, 100 Nev. 582, 585, 691 P.2d 414, 416 (1984) (quoting Cooley v. United States, 501 F.2d 1249, 1252 (9th Cir. 1974), *cert. denied,* 419 U.S. 1123 (1975)). In *Arajakis,* this court stated:

> "The test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case."

108 Nev. at 980, 843 P.2d at 802-03 (quoting People v. Bloom, 774 P.2d 698, 716 (Cal. 1989), *cert. denied,* 494 U.S. 1039 (1990)). Based on the record as a whole, we believe Graves made a valid waiver. To the extent that any of our prior cases hint that specific matters should be part of a canvass that go beyond the general requirements of *Faretta,* we note that those specific matters are not constitutionally required for a valid waiver where it is apparent from the record that the defendant was aware of the dangers and disadvantages of self-representation.

Defendants like Graves have had several encounters with the court system and many years of experience in jailhouse tutelage in manipulation of the law. They understand that if they represent themselves, there is a good chance that an appeals court will reverse their convictions. It is unfair to the citizens of this state to give these defendants new trials when they insist on representing themselves despite all warnings. Furthermore, Graves had competent counsel standing by throughout his trial for consultation. His judgment of conviction cannot be reversed on the basis of his knowing and intelligent choice to represent himself.

Graves next claims that there was insufficient evidence to convict him of burglary.[1] As to the Fremont incident, he asserts that the jury could not have inferred from the evidence that he had the necessary intent to commit larceny when he entered the Fremont Casino. He claims that his walking in and out of casinos proves nothing, as people do this activity every day. Next, he claims that the evidence merely demonstrated that he dropped some coins beside a patron, bent down to pick up the coins, and engaged in conversation with the patron. Indeed, the two police officers observing Graves testified that they did not see Graves commit a crime while in the Fremont. As to the Horseshoe incident, Graves insists that there was no evidence beyond a reasonable doubt that Graves actually took anything from the cashier's booth. Moreover, he claims that the evidence did not demonstrate, to the required level, that he had the intent to steal when he entered the Horseshoe Casino.

The standard for determining whether a jury verdict is supported by substantial evidence is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

We conclude that substantial evidence existed to allow a jury to find that Graves committed two counts of burglary beyond a reasonable doubt.[2] We note that "[b]ecause burglary is com-

---

[1]NRS 205.060 provides: "Every person who, by day or night, enters any house, room, apartment, . . . or other building . . . with intent to commit grand or petit larceny, assault or battery on any person or any felony, is guilty of burglary."

[2]Graves and his partner did not gamble, drink or eat while in the casinos. At the Fremont, police observed Graves' partner sit down by an elderly, male patron who was playing slots. After a minute, Graves' partner walked over to

monly committed in secret, . . . it frequently must be proved by circumstantial evidence." Edwards v. State, 90 Nev. 255, 258, 524 P.2d 328, 331 (1974).

Graves next claims that the two charges of burglary are substantially different and do not evidence a common scheme or plan and therefore the two burglary charges were improperly joined in the information. The first charge of burglary related to an alleged attempt to steal money from a patron of the Fremont. The second charge related to an alleged effort to steal money from a cashier's booth. Graves insists that these acts do not represent a common scheme or plan or involve the same act or transaction as is required by NRS 173.115. He claims that the proof presented at trial regarding his intent to steal from the cashier's booth was highly prejudicial to the charged intent to steal at the Fremont, given the lack of evidence that he actually stole anything at the Fremont.

NRS 173.115 states:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are:
> 1. Based on the same act or transaction; or
> 2. Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

---

Graves and had a brief conversation. Graves then approached the patron's right side and dropped some coins on the floor next to the patron. The patron stood up, and Graves engaged the patron in conversation. Graves' partner then approached the patron's left side, but the patron turned around and observed Graves' partner approaching. Graves' partner, who was within inches of the patron, hesitated and retreated. Graves finished picking up the coins, walked around a bank of slot machines to meet his partner, and police overheard Graves tell his partner, "you can't hesitate." Leaving the casino, Graves appeared upset and was making animated hand expressions.

Later that evening, police observed Graves and his partner standing close to the Horseshoe Casino's change booth. The cashier testified that as Graves' partner approached the change booth with three dollars in quarters, the cashier's telephone rang, so the cashier turned her back to the booth window. At that time, police observed Graves approach the booth, reach his arms into the booth, grab something, and pull his arms away with coins flying through the air. The cashier observed Graves pulling his arms out of the booth near where the $1 tokens were kept, and later, she discovered that twenty $1 tokens were missing. Police observed Graves with a handful of coins, and Graves and his partner picked up the fallen coins and subsequently cashed in $10 worth of tokens and $3 worth of quarters. (Even though the cashier suspected larceny, the hotel's policy is to not question the patron without firm proof.) This incident was also recorded by the casino's surveillance cameras. It was thereafter determined that Graves had taken money. Graves and his partner quickly left the Horseshoe Casino.

The district court did not abuse its discretion in allowing the two charges to be joined because the two charged offenses were part of a common scheme or plan and factually connected. *See* State v. Boueri, 99 Nev. 790, 672 P.2d 33 (1983). Graves systematically walked from casino to casino and acted similarly suspicious at each casino. Consequently, the two charged offenses were sufficiently connected to comprise a common scheme or plan.

Because Graves specifically requested that his trial be held within 60 days, he contends that the district court abused its discretion in overruling his objection and postponing the trial three weeks and then later postponing the trial another day.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . ." U.S. Const. amend. VI. The factors to be considered in assessing a denial of a speedy trial claim are: "the length of the delay, the reason for the delay, the assertion of the right, and prejudice to the accused." Brinkman v. State, 95 Nev. 220, 222, 592 P.2d 163, 164 (1979) (citing Barker v. Wingo, 407 U.S. 514 (1972)). NRS 178.556(1) provides that a defendant should be brought to trial within 60 days after the arraignment on the indictment or information. Nevertheless, in Rodriguez v. State, 91 Nev. 782, 542 P.2d 1065 (1975), this court concluded that the "failure to set a trial within 60 days is not per se equatable to a denial of a speedy trial." *Id.* at 784, 542 P.2d at 1065.

We conclude that the court rationally postponed the trial to allow Graves, who moved to represent himself the first day of trial, more time to prepare his defense. *Cf. Brinkman,* 95 Nev. at 223, 592 P.2d at 164-65 (161 day delay between time information was filed and trial not prejudicial to defendant when delay mostly occasioned by actions of defendant or his attorney); Hampton v. Sheriff, 86 Nev. 157, 465 P.2d 615 (1970) (any delay in bringing habeas corpus petitioner to trial was a direct result of his conduct and choice of procedural maneuvers). The fifteen-day delay certainly was not oppressive and had no prejudicial effect on Graves. *See Brinkman,* 95 Nev. at 223, 592 P.2d at 165; *Ex Parte* Hansen, 79 Nev. 492, 495, 387 P.2d 659, 660 (1963).

Graves next contends that there is no evidence that he was engaged in criminal activity on the day he was arrested. Indeed, the arresting officer admitted that he did not observe Graves commit any wrongdoing on the day of his arrest. Graves argues that it was improper for the police to arrest him without a warrant for alleged criminal actions he had performed twenty-four hours earlier. He notes that the police continued observations of him for several hours before arresting him, and they did not obtain an

arrest warrant. Because the police had more than sufficient time to obtain an arrest warrant and Graves did not commit any criminal activity the day of his arrest, he argues that his Fourth Amendment rights were violated and that the convictions should be set aside.

We first note that an illegal arrest alone does not entitle a defendant to have a conviction set aside. United States v. Crews, 445 U.S. 463, 474 (1980) ("[T]he illegality of [a defendant's] detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct."). In any event, we conclude that there was probable cause to support Graves' arrest, and it therefore was legal. Given the surrounding facts of the burglaries, probable cause did not fade away merely because the police arrested Graves the following day. "Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." Hoffa v. United States, 385 U.S. 293, 310 (1966). Accordingly, we conclude that Graves' arrest did not violate his constitutional rights.

For the foregoing reasons, we affirm Graves' judgment of conviction.

STEFFEN, C. J., and YOUNG, J., concur.

ROSE, J., with whom SPRINGER, J., joins, dissenting:

I dissent. The district court failed to adequately canvass Graves to establish that he intelligently and knowingly waived his right to counsel.

A criminal defendant has the right to self-representation under the Sixth Amendment of the United States Constitution. Faretta v. California, 422 U.S. 806, 818-19 (1975). However, an accused who chooses self-representation must knowingly and intelligently waive the right to counsel.[1] Id. at 835. Such a choice can be

---

[1] It is also important to note that a district court has the discretion "to deny a request for self-representation on the ground of untimeliness alone, if the request is not made within a reasonable time before commencement of trial or hearing and there is no showing of reasonable cause for the lateness of the request." Lyons v. State, 106 Nev. 438, 445-46, 796 P.2d 210, 214 (1990), cert. denied, _____ U.S. _____, 113 S. Ct. 1824 (1993). A request is timely when it is early enough to allow the defendant to prepare for trial without a continuance. Id. at 446, 796 P.2d at 214.

Graves' trial was set to begin on June 1, 1993. Just one week before that, on May 25, the district court learned that Graves intended to move to

competent and intelligent even though the accused lacks the skill and experience of a lawyer, but the record should establish that the accused was made aware of the dangers and disadvantages of self-representation. *Id.*

The trial court must canvass a defendant to determine whether his or her waiver of the right to counsel is valid. Cohen v. State, 97 Nev. 166, 168, 625 P.2d 1170, 1171 (1981).

> "To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered."

*Id.* (quoting Garnick v. Miller, 81 Nev. 372, 376, 403 P.2d 850, 853 (1965)).

The test of the validity of a waiver is not whether the court explained the elements of the charged offense or possible defenses to the defendant or provided other specific warnings or advisements, " 'but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case.' " Arajakis v. State, 108 Nev. 976, 980, 843 P.2d 800, 802-03 (1992) (quoting People v. Bloom, 774 P.2d 698, 716 (Cal. 1989), *cert. denied,* 449 U.S. 1039 (1990)). Determining the validity of a waiver of the right to counsel requires "a fact-specific inquiry focused on the background, experience and conduct of the accused." Haberstroh v. State, 109 Nev. 22, 25, 846 P.2d 289, 292, *cert. denied,* 510 U.S. 858, 114 S. Ct. 169 (1993).

vass as a whole and it is not necessary that the accused establish that he is competent to represent himself, these cases establish that certain matters should be part of a *Faretta* canvass. These matters are: (1) the nature of the charges, (2) the sentences for

---

represent himself. On June 1, the day set for trial, Graves formally requested that he be allowed to represent himself, and the court canvassed him and granted the request. Over Graves' objection, the court reset the trial to June 28 to provide Graves with time to prepare.

Since the district court here found a continuance necessary, it had the authority to deny the request as untimely if Graves did not show reasonable cause for the lateness of the request. However, the court failed to inquire into the reasons for the late request.

each charge and the total possible sentence the defendant could receive, (3) the possible defenses and mitigating facts the defendant might be able to assert, (4) the background and education of the accused, (5) the defendant's experience with and understanding of the legal system, and (6) the defendant's understanding of the right to legal representation that he is surrendering and the disadvantages of self-representation.

The canvass that Graves underwent did not enable the trial court to determine whether Graves' waiver of his right to counsel was knowing and intelligent, and the record as a whole does not demonstrate that Graves understood the dangers and disadvantages of self-representation. The canvass informed Graves only of the dangers of self-representation and that the court thought it a bad idea. The trial court did not determine that Graves understood the nature of the charges he faced, possible defenses or mitigating circumstances, or the range of the allowable punishments involved, and it did not inquire into the background, education, or experience of the defendant. Particularly significant was the court's failure to discuss with Graves the severe risks he faced in the form of the habitual criminal enhancement sought by the State.

The canvass consisted primarily of the trial court's admonishments to Graves to the effect that he was foolish to forgo counsel and a number of questions that elicited pro forma affirmatives from Graves. Graves' only response that was more than a brief affirmative was his statement that he had had the preliminary transcript for over a month, had reviewed it and the police reports several times, and was ready. It was, of course, appropriate for the court to advise Graves that if he represented himself, he would be held accountable to court procedures, rules, and decorum. However, the court did not inquire into Graves' understanding of the complexity of those procedures and rules and the difficulty of conforming to them. It was also appropriate for the court to inform Graves that he would be giving up the right to appeal his case based on ineffective assistance of counsel and that his standby counsel would not be permitted to make objections for him during the course of a trial. However, these warnings did not establish a record that demonstrates that Graves was aware of the dangers and disadvantages of self-representation.

The canvass did not provide the trial court with an opportunity to assess the intelligence of Graves' waiver because the court did not elicit from Graves responses indicating his knowledge of the case or his understanding of how lack of a counsel could hinder his defense. The court's leading questions did not draw forth answers that revealed the extent of Graves' understanding or

misunderstanding of the risks and complexities of his case and the dangers of self-representation.

The district court did not canvass Graves as to his background and experience. Nothing in the record, including his conduct during the trial, shows that he had sufficient education and experience to allow this court to conclude that his waiver of the right to counsel was knowing and intelligent. *Cf. Haberstroh,* 109 Nev. at 29, 846 P.2d at 292-93 (mechanical performance of *Faretta* canvass unnecessary where appellant had previously been thoroughly canvassed, competently represented himself at earlier trial, completed high school and two years of college, researched and wrote his own motion to proceed pro se, and appeared intelligent, under control, and familiar with the evidence against him at trial).

This court should reverse because the district court's canvass failed to establish that Graves knowingly and intelligently waived his right to counsel.